UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHERWED ANN NOEL,

          Plaintiff,

v.

          Case No. 19-11493
          District Judge Victoria A. Roberts
          Mag. Judge Anthony P. Patti

CARITE OF GARDEN CITY, LANG
AUTOMOTIVE INC.,
KEITH LANG, and DANNY MACDONALD,

          Defendants.
_____/

**<u>ORDER GRANTING IN PART and DENYING IN PART: (1) PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT [ECF No. 44] and (2)
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [ECF No. 50]</u>**

## I.    INTRODUCTION

"Nigger" or "Nigga" is a racial epithet. *See Mack v. Wayne Cty. Cmty.
Coll.*, No. 18-13986, 2020 WL 2542054, at 5 (E.D. Mich. May 19, 2020)
(describing the word "Nigga" as "derogatory" and "racial language"). One
Defendant believes the word "Nigga" is a casual term of endearment in the
African American community. While admitting to its use, Defendants say the
use of the epithets was not sufficiently severe or pervasive and the Court
should grant their motion for summary judgment. Noel says she engaged in

protected activity when she complained in a pre-suit letter of the use of these epithets in the workplace and was terminated. She seeks judgment as well.

For the various reasons discussed below, the Court grants in part and denies in part both pending motions.

Sherwed Ann Noel ("Noel") sues CARite of Garden City ("Garden City"), Lang Automotive, Inc. ("Lang Automotive"), Keith Lang ("Lang") and Danny MacDonald ("MacDonald") (collectively, "Defendants") alleging, among other things, wrongful termination and retaliation in violation of the Elliott-Larsen Civil Rights Act, M.C.L. § 37.2101, et seq ("ELCRA"), Title VII, 42 U.S.C. § 2000e, et seq ("Title VII"), hostile work environment and the violation of Noel's contractual rights under 42 U.S.C. §1981.

Noel originally filed this complaint in Wayne County Circuit Court. On May 21, 2019, Defendants agreed to remove the case to this court. The next day, Defendants CARite, Inc., CARite Corporate, LLC filed a Rule 12(b)(6) motion to dismiss. The Court granted their motion.

Noel now moves for partial summary judgment on Count V (Retaliation-Termination of Plaintiff's Employment ELCRA), Count VI (Retaliation-Termination of Plaintiff's Employment under Title VII) and Count VII (Violation of 42 U.S.C. §1981). [ECF No. 44]. Defendants filed a cross-

motion for summary judgment. Defendants request the Court to dismiss all seven claims against them: the three above as well as: Count I (Wrongful Termination under the ELCRA), Count II (Wrongful Termination under Title VII), Count III (Racial Harassment / Hostile Work Environment under ELCRA), Count IV (Racial Harassment / Hostile Work Environment under Title VII). [ECF No. 50].

## II.    BACKGROUND

On or about February 1, 2013, Noel, an African American female, began her employment as a car sales consultant at Garden City. CARite of Garden City is a subsidiary of Lang Automotive, which is owned by Keith Lang. During the next five years at Garden City, Noel says she experienced a culture tolerant of the term "Nigga" and/or "Nigger" causing her to become increasingly uncomfortable in the workplace. [ECF No. 50-2]. Although several employees at Garden City used the word in the workplace, Danny MacDonald, a fellow car sales consultant, used "Nigga" most frequently. MacDonald, a fifty-six-year-old Caucasian male, regularly used some variation of the word "nigga" or "nigger" to greet friends, co-workers, family members, and, at times, customers. MacDonald believes the word "nigga" is a casual term of endearment in the African American community. [ECF No. 50-4, PageID.2498].

3

Noel both overheard and was called "Nigga" at work. Although MacDonald's behavior troubled Noel, she claims to have routinely brushed it off. At various times she noted her discomfort with MacDonald's behavior to Keith Barnes ("Barnes"), Garden City's General Manager and Greg Rexin ("Rexin"), Garden City's sales manager, but never filed a formal complaint.

On February 26, 2018, Noel overheard MacDonald, while in the presence of Lang and Barnes, say to one of the men in the group "[h]ey, what's up my nigga," and then fist bump the individual. [ECF No. 50-4, PageID.2497]. At that point, Noel confronted MacDonald. He responded, saying "I can say whatever I want to say, Nigga, Nigga, Nigga." [ECF No. 392, Page ID.639]. Noel says MacDonald continued to use "Nigga" after the February 2018 incident. [ECF No. 50-2, PageID.2362].

On February 27, 2018, one day after the incident, Lang issued a written warning to MacDonald to cease using the term "nigga," "nigger" or any variation of the word. [ECF No. 50-4, PageID.2621]. If he persisted, the letter continued, he would be fired. On March 26, 2018, approximately one month after the incident, Lang held a mandatory meeting with all sales staff addressing the usage of the expression at work and announcing a zero-tolerance policy for the use of racially derogatory language. Despite the

warning, Noel says MacDonald continued to use the epithet "Nigga" after the March 26th meeting. [ECF No. 50-2, PageID.2328].

Noel hired an attorney who sent a pre-suit letter to Defendants, on April 11, 2018, announcing Noel's intention to sue Defendants alleging racial harassment, and a racially hostile work environment, race and gender discrimination. [ECF No. 50-4, PageID.2625]. The letter noted that Noel would be interested in settling the dispute, but that she sought a substantial amount of money. *Id.* The letter also urged Defendants to settle because the "scandalous" behavior of the parties would be publicized as a result of litigation. *Id.* On April 12, 2018, Lang received the pre-suit letter on his fax machine, read the letter, and on the same day fired Noel. He claims to have interpreted the letter to be an "extortion attempt." [ECF No. 44-2, PageID.2258].

Lang contends that he fired Noel for her incompetency, lack of professionalism, lying, negativity, and failure to be a team player; however, before receiving the pre-suit letter from Noel's attorney, Noel had not received any disciplinary actions, a final warning or a notice of discharge. [ECF No. 40-11, Page ID. 1098]. Lang claims that he wanted to fire Noel since 2014, but that General Manager Barnes would "always save her"

because she was consistently one of the top two salespersons and part of Barnes' income is comprised of car sales commission.

Noel timely filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging gender and race discrimination, as well as retaliation.

She received a right to sue letter.

## III.   STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), "[t]he Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The movant bears the initial burden to inform the Court of the basis for its motion; it must identify particular portions of the record that demonstrate the absence of a genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant satisfies its burden, the non-moving party must set forth specific facts showing a genuine issue for trial. *Id.* at 324. Unsupported, conclusory statements are insufficient to establish a factual dispute to defeat summary judgment, as is the "mere existence of a scintilla of evidence in support of the [non-movant's] position"; the evidence must be such that a reasonable jury could find in its favor. *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Alexander v. CareSource*, 576 F.3d 551, 560 (6th Cir. 2009).

In deciding a summary judgment motion, the Court "views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). The Court need only consider the cited materials, but it may consider other evidence in the record. Fed. R. Civ. P. 56(c)(3). The Court's function at the summary judgment stage "is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249. "The standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation." *Lee v. City of Columbus*, 636 F.3d 245, 249 (6th Cir. 2011).

## IV.  ANALYSIS

### A. Retaliation Claim; "Employer Requirement" Under Title VII (Count VI)

The parties dispute whether Garden City meets the "employer requirement" of Title VII.

Under Title VII, the term "employer" means "a person engaged in an industry affecting commerce who has fifteen or more employees for each

7

working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person." 42 U.S.C.A. § 2000e. Persons having fewer than fifteen employees (and their agents) shall not be considered employers. *Id.*

In *Walters v. Metropolitan Educational Enterprises Inc.*, 519 U.S. 202, 204 (1997), the Supreme Court addressed whether this employment relationship exists only on working days on which the employee is actually receiving compensation from the employer. The Court said no and held that an employer has an employee on any working day on which the employer maintains an employment relationship with the employee. *Walters* 519 U.S. at 204.The *Walters* court endorsed the "payroll method" as an appropriate approach to determine whether the employer had an employment relationship with fifteen or more employees on each working day for twenty or more calendar weeks. *Id.* Under the "payroll method," whether the relationship exists is most readily demonstrated by the individual's appearance on the employer's payroll. *Id.* at 202.

The *Walters* Court rejected a "physically present," test, noting that "[w]hile the phrase "for each working day" suggests the possibility of a test based on whether an employee is actually at work on a given day, such a

8

test would be impossible to administer and reflects an improbable reading of the statute." *Id.* at 202–03.

The "ultimate touchstone" for determining the number of employees is "whether an employer has employment relationships" with individuals as determined by "traditional notions of agency." *See Grace v. USCAR*, 521 F.3d 655, 676 (6th Cir. 2008) (citing *Walters* 519 U.S. at 211). The *Walters* Court cited *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323–324 (1992) for the factors which have traditionally been considered to determine whether a hired party is an employee under the general common law of agency:

> "[a]mong the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party." *Id.*

This "common-law test contains 'no shorthand formula or magic phrase that can be applied to find the answer, ... all of the incidents of the relationship must be assessed and weighed with no one factor being decisive.'" *Nationwide*, 503 U.S. 318 at 324.

9

### i. Title VII Numerosity Analysis

The working days for Garden City are Monday – Saturday. CARite of Garden City, *Homepage*, https://www.carite.com/location/carite-of-garden-city (last visited Sept. 9, 2020). The current or proceeding calendar years, for the purposes of the retaliatory discharge claim, are 2018 and 2017. Noel produced an employee list for 2018; Defendants produced one for 2017-2019.

Noel lists sixteen Garden City employees for 2018. She includes names of employees from CARite of Garden City and CARite of Taylor—both owned by Lang Automotive. Noel provides no authority to support the contention that the Court can combine employees from separate entities for Title VII purposes.

Defendants list the number of employees present at Garden City, by week, from January of 2017 through December of 2019. [ECF No. 52, PageID.2675] and [ECF No. 50-2, PageID.2303]. According to Defendants' list, the number of employees fluctuated between ten and fourteen employees per week. *Id.* Noel says that this list is incomplete because it does not include some individuals Noel worked with in 2018. For example, Keaton

Lang and Jim Owens are on Noel's employee list but not on Garden City's. [ECF No. 51, PageID.2670].

Neither party met its burden under the payroll method or traditional notions of agency to demonstrate that no genuine dispute exists regarding the number of Garden City employees for Title VII purposes.

### 1. Common Law of Agency

Both parties fail to include information with which the Court can conclude that each individual on their respective lists meets the definition of an "employee" under Title VII. Neither list contains any information regarding the level of supervision over day-to day work, salary and hour information, tax treatment, or the provision of employee benefits. Defendants cite *Nationwide* but neglect to engage in the factual analysis *Nationwide* requires.

### 2. Payroll Method

Noel fails to explain which employees were employed by week and fails to include an employee list for 2017. Noel does not describe whether the individuals listed are on Garden City's payroll. The bottom line is that Noel provides no information that would assist the Court in applying the payroll method.

Defendants fare only slightly better. They provided the number of employees present on any given week during 2017, 2018 and 2019. While this accounting captures the weekly tabulation Title VII requires, it fails to provide the total number of employees on the employer's *payroll* from week to week. Even so, Noel, by including names that were not included on Defendants' 2018 list, introduces a material factual dispute.

Triable questions of fact exist regarding whether Garden City employed fifteen or more employees. Because this prerequisite condition is unmet, the Court declines to address the merits of the Title VII Retaliation Claim (Count VI).

### B. Anti-Retaliation Claim under the ELCRA (Count V)

The ELCRA prohibits discrimination or retaliation against a person "because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding or hearing under this act." Mich.Comp.Laws Ann. § 37.2701(a).

To establish a prima facie case of unlawful retaliation under the ELCRA, a plaintiff must show "(1) that [s]he engaged in a protected activity; (2) that this was known by the defendant; (3) that the defendant took an employment action adverse to the plaintiff; and (4) that there was a causal

12

connection between the protected activity and the adverse employment action." *El-Khalil v. Oakwood Healthcare, Inc.*, 504 Mich. 152, 161, 934 N.W.2d 665, 670–71 (2019).

A retaliation claim can be established either through direct evidence of retaliation or circumstantial evidence that would support an inference of retaliation. *See Redlin v. Grosse Pointe Pub. Sch. Sys., 921 F.3d 599, 606 (6th Cir. 2019)*. "The direct evidence and the circumstantial evidence paths are mutually exclusive; a plaintiff need only prove one or the other, not both." *Kline v. Tennessee Valley Auth.*, 128 F.3d 337, 348 (6th Cir.1997).

ELCRA claims are generally "analyzed under the same evidentiary framework used in Title VII cases." *Humenny v. Genex Corp.*, 390 F.3d 901, 906 (6th Cir. 2004). However, there are two distinctions that differentiate the requirements of an ELCRA retaliation claim from those of a Title VII retaliation claim*. See Helmi v. Solvay Pharms., Inc.*, No. 05-36, 2006 U.S. Dist. LEXIS 84562, at 40-41 (W.D.Mich. Nov. 21, 2006).

The first distinction concerns the egregiousness of defendant's conduct. *See Schmitt v. Solvay Pharm.*, Inc., No. 06-11791, 2007 WL 3173323, at 4 (E.D. Mich. Oct. 29, 2007). Under the ELCRA, the employer need only take an employment action that is adverse to the plaintiff. Title VII,

in contrast, requires the alleged retaliatory employment action to be "materially adverse." *See Jones v. Johanns*, 264 Fed.Appx. 463, 466 (6th Cir.2007) (citing *Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 542 (6th Cir.2003). This element is not at issue here; both parties agree that Noel was terminated by Garden City. Termination, under the ELCRA, is a sufficiently adverse employment action. *See Pena* 255 Mich.App. 299, at 312 (Mich.Ct.App.2003) (explaining "[a]lthough there is no exhaustive list of adverse employment actions, typically it takes the form of an ultimate employment decision, such as a termination in employment.")(internal quotations omitted).

Secondly, under Title VII, direct evidence "requires no inferences to conclude that unlawful retaliation was a motivating factor in the employer's action." *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 544 (6th Cir.2008). In contrast, the ELCRA "requires a showing that the plaintiff's protected activity was a 'significant factor' in the employer's adverse action*." Lange v. City of Benton Harbor*, 111 F. Supp. 3d 785, 791 (W.D. Mich. 2015) (citing *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 527 (6th Cir.2008)).

### a. Garden City is an "Employer" under the ELCRA

An "Employer" under the ELCRA is defined as a person who has one or more employees and includes an agent of that person. M.C.L.A. 37.2201.

Garden City's supplemental documentation shows that it employed at least ten persons on any given day; Garden City was an "employer" for purposes of Noel's ELCRA retaliatory-discharge claim.

### b. Noel Engaged in Reasonable Opposition Activity

Noel says that she engaged in opposition activity when she submitted her letter to Lang expressing her intention to sue Garden City under Title VII and the ELCRA. Defendants say that Noel was not engaged in protected opposition activity because the letter urged a settlement of her claim for a significant sum of money, indicated a willingness to publicize the alleged discriminatory behavior, and was viewed by Lang as an extortion attempt.

Under Title VII, a plaintiff is engaged in opposition activity when she opposes, "any practice made unlawful by this title, or because [she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title." 42 U.S.C. § 2000e-3(a). The Sixth Circuit recognizes that "[t]he opposition clause protects not only the filing of formal discrimination charges with the EEOC, but also complaints to management and less formal protests of discriminatory employment practices." *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014).

To come within the protection of Title VII, Noel must show she challenged an employment practice that she reasonably believed was unlawful. *Johnson v. University of Cincinnati*, 215 F.3d 561, 580 (6th Cir. 2000).

In order to qualify as opposition activity, "the actions of the plaintiff need not formally invoke the protection of ELCRA." *Bromley v. Parisian, Inc.*, 55 F. App'x 232, 236–37 (6th Cir. 2002). If an adverse employment decision "is a result of that employee raising the spectre[sic] of a discrimination complaint, retaliation prohibited by the act occurs." *McLemore v. Detroit Receiving Hosp.*, 196 Mich.App. 396, 493 N.W.2d 441 (1992). Nevertheless, the employee "must do more than generally assert unfair treatment." *Id.* An employee's complaint must "clearly convey to an objective employer that the employee is raising the specter of a claim of unlawful discrimination." *Bromley* 55 F. App'x 232 at 236 (citing *Barrett v. Kirtland Cmty. Coll.*, 245 Mich.App. 306, 318–19 (2001).

On April 11, 2018, Noel presented a formal letter to her employer informing Defendants of her intention to sue for violation of her civil rights under MCL 37.2101, et seq. [ECF No. 24-1 Page ID.337-338]. The letter is entitled "RE: Ms. Sherwood Noel, Racial Harassment, Racial and Gender Discrimination." *Id.* It explains that Noel retained an attorney "to represent

16

her in her claims of racial harassment, racially hostile work environment, race and gender discrimination by CARite." *Id.* Lang got the letter and decided to fire Noel on the same day he received it, in part because Noel sent the letter. Lang says that the letter was the "final straw." [ECF No. 44, PageID.1195].

Noel's activity was reasonable and did not so interfere with the performance of her job that it rendered her ineffective as a car saleswoman. In fact, Noel was "always first or second" on the list of top employees for selling cars. [ECF No. 44-2, PageID.1298]. *Cf. Brown v. Ralston Purina Co.*, 557 F.2d 570, 572 (6th Cir.1977) ("an EEOC complaint creates no right on the part of an employee to miss work, fail to perform assigned work, or leave work without notice.")

Based on the evidence presented, Noel reasonably believed she faced unlawful discrimination at Garden City and sufficiently raised the specter of a claim of unlawful discrimination. The Court finds that Noel engaged in reasonable opposition activity and is entitled to protection under ELCRA's opposition clause.

### c. Direct Evidence

Noel contends that she presents direct evidence of retaliation.

Under Title VII, direct evidence "requires no inferences to conclude that unlawful retaliation was a motivating factor in the employer's action." *Imwalle* 515 F.3d 531 at 544. Under the ELCRA, however, direct evidence requires no inferences to conclude that unlawful retaliation was a significant factor in the employer's adverse employment action. *Barrett* 245 Mich.App. 306, at 628; *see also Mickey* 516 F.3d 516 at 523.

An employee who presents direct evidence of improper motive by her employer need not disprove other potential nonretaliatory reasons for the adverse action. *Weigel v. Baptist Hosp. of E. Tennessee*, 302 F.3d 367, 381 (6th Cir. 2002). Instead, "the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive." *Id.* It is "well settled" that if a plaintiff presents direct evidence of discrimination, she need not proceed under the *McDonnell Douglas* burden shifting formula. *Id.*

### ii. Noel presents direct evidence of an improper retaliatory motive by her employer.

Lang's statements during his deposition prove that the April 12, 2018 letter was a significant factor in his decision to terminate Noel. Lang testified:

18

Q. Okay. And so you terminated her at the time that you got that letter. And why did you do it at the time you got the letter?

A. There's a bunch of stuff led up to, and then that day she just brought that and I've been trying to fire her since 2014, but my GM would always save her, you know, "Keep her, keep her, keep her."

Q. So the letter was part of the reason?

A. Yes, that was just the final straw. [ECF No. 44-2, PageID.1274].

Lang further states,

Q. And the reason that she wasn't fired before you got that letter is because the letter was in part one of the reasons why you terminated her, correct?

A. It is one of the reasons, yes.

Q. And you as much as admitted that during that hearing, correct?

A. I told them exactly that. Not admitting. That's the truth.

Q. That you didn't want anybody working for you who's going to sue you, right?

A. No, that is suing me. I'm in a lawsuit.

Q. Is suing you?

A. Right, she's asking me for a substantial amount of money.

Q. So why should you have somebody who's working for you who's going to sue you, right?

A. Correct.

Q. And you knew she was suing you, or the letter said that she was putting you on notice that you were going to be sued because of racism at your company, correct?

A. Correct. [ECF No. 44-2, PageID.1329].

Noel engaged in opposition activity and Lang was aware of that activity. Lang fired Noel on April 12, 2018 – in part – because of her opposition activity. This is direct evidence of improper motive by Garden City.

> ### iii. Defendants fail to prove, by a preponderance of the evidence, that they would have fired Noel absent the impermissible motive.

Defendants present a myriad of non-retaliatory reasons for why they fired Noel. Lang testified that since 2014, he wanted to fire Noel for her

incompetency, lack of professionalism, lying, negativity, and for not being a team player, but Lang's General Manager, Barnes, always stopped him from firing her. [ECF No. 50-2, PageID.2285]. Lang claims that the reason Barnes refused to fire Noel is because she was one of the top car sales associates at Garden City and Barnes received commission for each car sale. [ECF No. 44-2, PageID.1297-1298]. Noel, on the other hand, claims that her behavior at work could not have been as problematic as Lang states; at no point before her termination had she been the subject of disciplinary action.

Despite these articulated concerns, they were not significant enough to warrant a single disciplinary action over the course of Noel's five years of employment at Garden City. Lang himself confirmed in his deposition that before receiving the pre-suit letter from Noel's attorney, Noel had not received a final warning or a notice of discharge. He testified:

Q Sir, you got the letter on what day?

A. The 12th, the day she was let go.

Q. And did you have any discussions with Ms. Noel about she [sic] was going to be terminated prior to receiving that letter that you were being sued?

21

A. Personally, I did not. [ECF No. 40-11 Page ID.1106-1107].

Importantly, Lang had never written up Noel for misconduct or disruptions. [ECF No. 40-11 Page ID.1105]. Although Defendants allege Noel was "incompetent," Lang also admits in his deposition that "'[y]ou know she sells cars" and she did. She was always first or second on the list, she did a great job for us as far as selling units.' [ECF No. 44-2 PageID.1298]. The lack of documentation evincing Lang's intentions to fire Noel due to alleged incompetency, Noel's proficiency at the job and the timing of the firing, all suggest that Defendants would not have fired Noel if she had not engaged in protected opposition activity.

Defendants fail to meet their burden to prove, by a preponderance of the evidence, that absent the impermissible motive, they would have still fired Noel on April 12, 2018. Without any evidence of disciplinary action taken over the five years of Noel's employment at Garden City, no reasonable juror could believe the proffered alternative reasons for Noel's termination. No inferences are needed to conclude that unlawful retaliation was a significant factor in Defendants' adverse employment action.

There is no genuine dispute of material fact: the letter significantly factored into Lang's decision to fire Noel and it is direct evidence of

unlawful retaliation; Noel is entitled to judgment as a matter of law. The Court grants her motion for summary judgment on Count V.

## C. Law of the Case Analysis – Application to Counts V & VI

If Noel establishes that Garden City is an employer under Title VII, this Court's findings in Count V (Retaliation/Termination of Plaintiff's Employment ELCRA) would apply with equal force to its analysis of Count VI (Retaliation/Termination of Plaintiff's Employment under Title VII). *See Edmonds v. Smith*, 922 F.3d 737, 739 (6th Cir. 2019) ("[f]indings made at one stage in the litigation should not be reconsidered at subsequent stages of that same litigation.").

## D. Wrongful Termination under the ELCRA (Count I)

Defendants say there are no facts to support a claim that racial discrimination fueled the decision to fire Noel. They say Noel was terminated because of "the letter from Mr. Mungo, Plaintiff's lies, bad attitude, non-professionalism and other conduct in the dealership." [ECF No. 50, PageID.2228]. Noel responds by noting that she was the only African American salesperson at Garden City. Noel maintains that her race was at least one factor in Garden City's decision to fire her, that Defendants were

predisposed to discriminate on the basis of race and that Defendants acted in accordance with that predisposition.

There are two ways to establish a prima facie case of race discrimination under the ELCRA. *Transou v. Electronic Data Systems,* 767 F.Supp. 1392, 1399 (E.D.Mich.1991). Under the "disparate treatment" approach, Noel must factually establish that: a) she is a member of an affected class; and b) she was treated differently than similarly situated members of a non-protected class. *See Id.* at 1400.

Under the "intentional discrimination" approach, Noel may establish a prima facie case of discrimination by showing that: 1) she is a member of an affected class, 2) an action was taken with respect to her employment, 3) the acting person was predisposed to discriminate against persons of the affected class, and 4) the acting person actually acted on that disposition. *Cox v. Electronic Data Systems Corporation, 751 F.Supp. 680, 690 (E.D.Mich.1990).*

Noel alleges both disparate treatment and intentional discrimination.

Noel fails to raise a genuine issue of material fact under the disparate treatment approach. For purposes of her disparate treatment claim, Noel must show that any employee with whom she seeks to compare her

treatment was similarly-situated in all respects. *Stotts v. Memphis Fire Department*, 858 F.2d 289, 294 (6th Cir.1988). Noel is an African American woman and is a member of a protected class. However, Noel fails to identify any other Garden City employee who is "similarly situated" to her. Specifically, she neglects to identify a white saleswoman who was not terminated when she engaged in similar protected activity. Instead, Noel vaguely references "similarly situated white employees" without providing detail. Conclusory allegations are insufficient evidence to establish a claim of discrimination using the disparate treatment analysis. *See Keys v. Humana, Inc.*, 684 F.3d 605, 610 (6th Cir. 2012) (citing *Ashcroft v. Iqbal*, 556 U.S. at 678, 679 (2009). Therefore, Noel failed to meet the second element of a prima facie case of racial discrimination under the disparate treatment approach.

Likewise, Noel fails to meet her burden to show that she was intentionally discriminated against because of her race. "To establish intentional discrimination, the plaintiff must demonstrate direct evidence of discrimination or present sufficient circumstantial evidence to allow an inference of discrimination. *Johnson v. Kroger Co.*, 319 F.3d 858, 864–65 (6th Cir.2003). Noel worked for CARite for over five years. Lang, Rexin and Barnes all acknowledge that she was consistently one of their top

salespeople. [ECF No. 50-4, PageID.2477]. What shocked Lang and spurred him into action on April 12, 2018 was not the realization that Noel was African American; it was the realization that Noel planned to sue him.

There is no direct or circumstantial evidence that Noel's race factored into Lang's decision to terminate her. Because Noel does not meet her initial *McDonnell Douglas* burden, Defendants have no obligation to rebut and they are entitled to summary judgment on Count I.

### E. Termination Under Title VII (Count II)

While a merits analysis on Noel's other federal claims must await resolution of whether Garden City is an "employer" for Title VII purposes, the Court disposes of this Count on its merits. Since Noel has no evidence of race discrimination, the Court grants Defendants' motion for summary judgment on Count II (Wrongful Termination under Title VII); for the same reason it grants their motion on Count I.

### F. Discrimination in Contract under 42 U.S.C. § 1981 (Count VII)

Noel argues that Defendants' termination of her employment impaired her right to make and enforce her employment contract in violation of 42 U.S.C. § 1981. More specifically, Noel alleges that Lang fired her in retaliation because she threatened to file a discrimination lawsuit against

26

them and that the retaliatory firing impaired her right to perform her employment contract with Garden City.

Defendants contend that there is no contract of employment because Noel was an at-will employee. As a result, they argue, she can be discharged for any reason or no reason at all. Defendants are clearly wrong.

42 U.S.C. § 1981 gives "[a]ll persons ... the same right ... to make and enforce contracts ... as is enjoyed by white citizens." *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 128 (2008). The term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. 42 U.S.C.A. § 1981.

42 U.S.C. § 1981 prohibits an employer from retaliating against an employee for opposing racial discrimination. *Herrera v. Churchill McGee, LLC, 545* F. App'x 499, 500 (6th Cir. 2013). However, §1981 retaliation claims are filed under 42 U.S.C.A Chapter 21 and are governed by the same burden-shifting standards as Title VII retaliation claims. *Wade v. Knoxville Utilities Bd.*, 259 F.3d 452, 464 (6th Cir. 2001).

Title VII claims use the definition of "employer" provided in 42 U.S.C.A. Chapter 21 § 2000e, which states "the term 'employer' means 'a person

engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person.'" 42 U.S.C.A. § 2000e.

As discussed above, a genuine issue of fact exists as to whether this requirement has been satisfied. Noel is not entitled to judgment as a matter of law on Count VII. Neither are Defendants.

## G. Racial Harassment / Hostile Work Environment Claims under the ELCRA (Count III) and Title VII (Count IV)

Defendants argue that Noel's claims of harassment fail, because Noel did not report her claims to Lang or Lorie Hamper, Garden City's Office Manager, as required by the Garden City Employee Handbook. Defendants also say that although MacDonald, a Caucasian man, used the word "Nigga" at various times on the job, MacDonald did not say "Nigga" in a discriminatory fashion: rather, he used it as a "regular upbeat greeting for his buddies, homeboys, relatives and friends." [ECF No. 50-4, PageID.2508]. A few isolated incidences, Defendants argue, do not show scorn or animosity towards the African American race. Therefore, Defendants say Noel has not

established a prima facie case of race harassment under the ELCRA or Title VII.

In response, Noel contends that MacDonald referred to her as "Nigga" to her face on multiple occasions. During one such incident, MacDonald told Noel that he could use the word whenever he wanted and said to her "Nigga, Nigga, Nigga." [ECF No. 39-2 Page ID.639]. Lang issued a warning letter to MacDonald as a result of this incident. Noel explains that she did not report incidences of racial harassment to Lang because Lang himself used the epithet "Nigga." Instead, she complained to Rexin and Barnes through electronic and oral communications. Noel also mentions that on a number of occasions she heard MacDonald refer to little black girls as "little mama," but he never used that phrase to greet young white girls. [ECF No. 50-2, PageID.2323]. MacDonald admits to using the phrase "little mama," but says he used it with White, Black and Hispanic people. [ECF No. 50-4, PageID.2500].

To establish a prima facie case of racial harassment under Title VII and the ELCRA, plaintiff must show: (1) she was a member of a protected class, (2) was subjected to unwelcome racial harassment, (3) the harassment was based on race, (4) the harassment had the effect of unreasonably interfering with her work performance by creating an intimidating, hostile or offensive

work environment, and (5) the employer knew or should have known of the harassing conduct but failed to take corrective or preventive action. *Bailey v. USF Holland, Inc.*, 526 F.3d 880, 885 (6th Cir. 2008).

Harassing conduct must be extreme. "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Hafford v. Seidner*, 183 F.3d 506, 512-13 (6th Cir. 1999). The harassment must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.* The test has both an objective and subjective element: the harassment must be so severe that a reasonable person would find it hostile or abusive; and the victim herself must regard the environment as hostile. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21(1993).

### a. Racial Harassment Test

The first element is not in dispute; Noel is an African American and a member in a protected class.

The second and third elements are easily dispensed of. *See Johnson v. United Parcel Serv., Inc.*, 117 F. App'x 444, 454 (6th Cir. 2004) ("[c]ase law makes clear that the use of the word "nigger," even taken in isolation, is

not a "mere offensive utterance."). *See Collins v. Faurecia Interior Sys., Inc.*, 737 F. Supp. 2d 792, 807 (E.D. Mich. 2010) (finding the use of word "Nigger" "racially offensive not just to Plaintiff, but to all African-Americans.") *See Curry v. SBC Commc'ns, Inc.*, 669 F. Supp. 2d 805, 815 (E.D. Mich. 2009) (describing either "Nigger" or "Nigg" as a "racial slur").

Noel clearly did not welcome the use of the racial epithet "Nigga" or "Nigger" even though MacDonald considered it to be a "term of endearment for the entire Black community." [ECF No. 50-4, PageID.2498]. She says they are both equally derogatory. Defendants say that Noel was not the victim of racial harassment because she largely only overheard the epithets. However, the Sixth Circuit has been abundantly clear that "the plaintiff need not be present at the time of the offensive conduct; instead, she or he can learn of the conduct second-hand. *Ladd v. Grand Trunk W. R.R.*, Inc., 552 F.3d 495, 500 (6th Cir.2009) (internal citations omitted). In conducting the inquiry, this Court may also "consider evidence of other acts of harassment of which a plaintiff becomes aware during the period [of her] employment, even if the other acts were directed at others and occurred outside of the plaintiff's presence." *Smith v. Rock-Tenn Servs., Inc.*, 813 F.3d 298, 309 (6th Cir. 2016). That MacDonald and Lang used "Nigga" on multiple occasions, is not in dispute; its frequency is.

31

The Court finds that Noel sufficiently demonstrates that she was the subject of unwelcomed racial harassment and the harassment was predicated upon her race.

Defendants contest the fourth element, whether the harassment affected a term or condition of Noel's employment, noting that she continued to work at Garden City for five years.  When assessing the hostility of a work environment, courts and juries consider the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it [was] physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfere[d] with an employee's performance." *Smith* 813 F.3d 298 at 309.

The Court finds a genuine dispute of fact regarding the frequency of both MacDonald's and Lang's use of the words "Nigger" or "Nigga" and MacDonald's use of the phrase "little mama." Noel alleges MacDonald's "continued use" of the term "Nigga" and notes at least one specific incidence on February 26, 2018 when MacDonald said "Nigger" three times to her face. [ECF No, 39-2 Page ID. 619-621 and 645]. When asked directly how many times she recalls MacDonald saying the word "Nigger," Noel remarks, "more than a dozen" times. [ECF No. 50-2, PageID.2317]. Defendants in their response to Noel's partial motion for summary judgment claim that

"MacDonald never made a racially derogatory statement to Noel." [ECF No. 50, PageID.2222]. However; Defendants, in their motion for summary judgment, admit to the February 26th incident. Defendants are vague as to the frequency of MacDonald's use of the word "Nigga" outside of the February incident. Furthermore, they say MacDonald uses the word "Nigga" as "his regular upbeat greeting for his buddies, homeboys, relatives and friends."

These facts are material to determining whether the incidents in question were simply isolated incidences or part of a pattern of behavior that was pervasive at Garden City such that it created an abusive working environment for Noel. Where individual instances of harassment do not on their own create a hostile environment, the accumulated effect of such incidents may result in a Title VII violation. *See Williams v. Gen. Motors Corp.*, 187 F.3d 553, 563 (6th Cir.1999). The Sixth Circuit cautions against separating such incidents and evaluating them individually, since that practice tends to ignore the totality of the circumstances, which must be considered, and "rob[s] the incidents of their cumulative effect." *Id.* at 561 (6th Cir.1999); *Curry* 669 F. Supp. 2d 805 at 834.

Like several circuit courts have instructed, "we consider whether harassment was so severe and pervasive as to constitute a hostile work

environment to be "quintessentially a question of fact."" *Smith* 813 F.3d 298 at 310. Genuine disputes here preclude this Court from making a determination as a matter of law on Count III. At trial, the jury would first need to determine if Garden City is an employer under Title VII before it could reach the merits of Noel's claim in Count IV.

Consequently, Defendants are not entitled to summary judgment on either Count III (Racial Harassment / Hostile Work Environment under ELCRA) or Count IV (Racial Harassment / Hostile Work Environment under Title VII).

## V. CONCLUSION

The Court **GRANTS IN PART** and **DENIES IN PART:** (1) Noel's motion for summary judgment and (2) Defendants' motion for summary judgment.

The Court:

1.  Grants Noel's motion for summary judgment with respect to Count V – Retaliation under the ELCRA. In all other respects, Noel's motion is Denied.

2.  Grants Defendants' motion for summary judgment with respect to Count I – Wrongful Termination under the ELCRA and Count

II – Wrongful Termination under Title VII. In all other respects,

Defendants' motion is Denied.

The following Counts will proceed to trial:

- Count III (Racial Harassment / Hostile Work Environment under ELCRA);

- Count IV (Racial Harassment / Hostile Work Environment under Title VII);

- Count VI (Retaliation/Termination of Plaintiff's Employment under Title VII); and

- Count VII (Violation of 42 U.S.C. §1981).

**IT IS ORDERED**.

s/ Victoria A. Roberts
Victoria A. Roberts
United States District Judge

Dated:  10/5/2020